**ZATUCHNI & ASSOCIATES LLC**
David Zatuchni, Esq. (2516)
1 West Street
Suite 100
New York, NY 10004
Phone: (212) 785-8980
Counsel for Plaintiff, Rita Ragone

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____
                                                    :
**RITA RAGONE**,                                    :
                                                    :          Civil Action No.:  07:CV:6084 (JGK)
          Plaintiff,                                :
                                                    :
v.                                                  :
                                                    :
**ATLANTIC VIDEO** at the Manhattan Center,         :
d/b/a **MCP-AV, INC.**; **ESPN INC.**; **WOODY**    :
**PAIGE**; **JAY CRAWFORD**; **TED NELSON**;        :
and, **LORI BERLIN**,                               :
                                                    :
          Defendants.                               :
                                                    :
_____:


**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' RESPECTIVE MOTIONS
TO DISMISS**

***On the Brief:***
**David Zatuchni, Esq.**
**Counsel for Plaintiff Rita Ragone**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT………………………………………………1

BACKGROUND FACTS………………………………………………………4

1.    Circumstances of Ms. Ragone Being Hired By Defendant Atlantic Video….4

II.    Ms. Ragone Is Subjected To Pervasive Sexual Harassment And Is Discharged In Retaliation For Her Complaints………………………………7

LEGAL ARGUMENT…………………………………………………………17

I.    THE ARBITRATION AGREEMENT IS UNCONSCIONABLE………………..17

A    Substantive Unconscionability……………………………………………17

1.    Shortening of Arbitral Forum Statute of Limitation <u>to 90 Days</u>…….18

2.    Fee Shifting Provision…………………………………………………20

3.    Arbitrator's Decision is "Non-Appealable"…………………………..30

4.    The Arbitration Agreement Impermissibly Denies Ms. Ragone Her Statutory Rights <u>In Court</u>……………………………………………..,33

B.    Procedural Unconscionability…………………………………………36

C.    The Unconscionability of the Arbitration Agreement Is Irredeemable, And Cannot Be Severed…………………………………………………...38

II.    THE GENUINESS OF THE ARBITRATION AGREEMENT PRODUCED BY ATLANTIC VIDEO IS DISPUTED, AND MS. RAGONE IS ENTITLED TO LIMITED DISCOVERY ON THIS ISSUE……………………………………...41

III.    MS. RAGONE IS NOT BOUND TO ARBITRATE HER DISPUTE AGAINST DEFENDANT ESPN BECAUSE SHE HAS NOT AGREED TO SUBMIT ANY CLAIMS AGIANST ESPN TO ARBITRATION……………………………………42

A.    As A Non-Party And Non-Signatory To The Arbitration Agreement, ESPN Cannot Enforce The Agreement Under Any Accepted Theory……………...42

B.    ESPN Was Not An Intended Beneficiary Of The Arbitration Agreement….47

CONCLUSION…………………………………………………………………49

## PRELIMINARY STATEMENT

Defendant Atlantic Video has made a motion to compel a private arbitration of Ms. Ragone's sexual harassment and retaliation claims brought under Title VII, the New York State Human Rights Law (NYSHRL), and the New York City Human Rights Law (NYCHRL).  In support, Atlantic Video relies on a purported Arbitration Agreement that was supposedly retrieved from Ms. Ragone's personnel file.   Atlantic Video's motion must be denied for several reasons.

First, Ms. Ragone did <u>not</u> enter into an arbitration agreement with Atlantic Video.  The genuineness of Ms. Ragone's signature on the Arbitration Agreement document is vigorously <u>disputed</u> by Ms. Ragone.   Atlantic Video, for its part, has not made the purported original or the document available for analysis or review, and does <u>not</u> even state whether an original exists.  Although Atlantic Video's current HR Director claims he retrieved the document from Ms. Ragone file, he does <u>not</u> state that he ever witness Ms. Ragone sign the document or that he himself even placed the document in the file.  Moreover, the document is suspect on its face as it is not even a "final" document.  It very clearly contains computer edits and modifications, evidencing that it was some type of draft in a computer. Given all these issues of fact, Ms. Ragone should at the very least be entitled to initial discovery on this issue of genuineness and for the opportunity to have the document reviewed by a handwriting expert.

Second, the purported Arbitration Agreement document is irredeemably tainted by <u>numerous</u> unconscionable, unenforceable, oppressive, overreaching, and one-sided provisions that render the entire agreement unconscionable in its purpose and effect.  The multiple unconscionable provisions have one overriding and impermissible goal, i.e. to deprive Ms.

Ragone of her statutory rights and protections and to deter her in the exercise of those rights and protections.

The Arbitration Agreement explicitly shortens Ms. Ragone's statute of limitations to even assert a claim in arbitration to <u>only 90 days</u>. Since this time-frame has already passed, and an arbitrator will be required to follow the explicit language in the Agreement, in seeking to compel arbitration, **Atlantic Video is in fact seeking to eviscerate all her claims altogether as untimely**. In short, if the court grant's Atlantic Video's motion, Ms. Ragone will lose her right to assert her statutory claims *in any forum*, even though she undisputedly complied with all her statutory limitations periods under Title VII, the NYSHRL, and the NYCHRL. This is a substantively unconscionable deprivation of Ms. Ragone's statutory rights to even assert her cause of action.

The Arbitration Agreement further explicitly deprives Ms. Ragone of the right to <u>any</u> judicial review of an arbitrator's decision or conduct, which has been specifically held to be unenforceable. More to the point, this is an unconscionable and impermissible deprivation of Ms. Ragone's statutory rights under the Federal Arbitration Act and in violation of New York law. It is well established that under the FAA, an Arbitrator's decision will be vacated by a district court if, *inter alia*, the arbitrator's decision is in manifest disregard of the law. Likewise, under New York law, an arbitrator's decision will be vacated if it is "totally irrational." The Arbitration Agreement <u>denies</u> Ms. Ragone these requisite statutory and constitutional protections.

The Arbitration Agreement further explicitly exposes Ms. Ragone to the risk of liability for Defendants attorneys fees simply if Ms. Ragone loses her case, i.e. Atlantic Video is a "prevailing party." This provision <u>vitiates</u> the protections afforded to Ms. Ragone by

authoritative and binding case law that holds that Ms. Ragone can only be held liable for Defendant's attorneys fees if there is a finding that her claims was "frivolous, unreasonable, or groundless." In short, the Arbitration Agreement, by failing to follow the applicable law in its explicit language with respect to fee shifting by the Arbitrator, impermissible exposes Ms. Ragone to an untenable and potentially ruinous financial liability that she would **not** be exposed to in court.

Indeed, the Arbitration Agreement further vitiates Ms. Ragone's statutory protections under the fee-shifting provisions of Title VII and the NYCHRL, which both provide that an award of attorneys fees is left to the court's "discretion." The Arbitration Agreement, in contrast, makes the awarding of attorneys fees by the Arbitrator <u>mandatory</u> to the "prevailing party." In short, in total contravention of Ms. Ragone's substantive statutory right and protections, an Arbitrator will be <u>required</u> to hold Ms. Ragone liable for attorneys fees if Atlantic Video "prevails", even if the Arbitrator determines that Ms. Ragone's claims were <u>**not**</u> "frivolous, groundless, or unreasonable."

Finally, the Arbitration Agreement even seeks to deny Ms. Ragone her statutory rights <u>in court</u>, let alone within arbitration. The Arbitration Agreement provides that in court, Ms. Ragone's statute of limitation is only six (6) months, effectively making it impossible to assert a Title VII claims due to the requirement to exhaust administrative remedies. The Arbitration Agreement also waives Ms. Ragone's right to a jury trial in court, and limits Ms. Ragone to only one (1) deposition. All of these provisions deny Ms. Ragone her statutory rights, and are unconscionable, oppressive, and unenforceable.

Numerous court's have routinely found that such "take it or leave it" arbitration agreement, that employees are compelled to sign as a condition of employment, without any real

opportunity to negotiate, are <u>unenforceable</u> in their entirety when containing multiple unconscionable provisions. The is precisely the situation here.

Defendant ESPN's motion to dismiss must also be denied for all the same reasons discussed above. In addition ESPN is not even a signatory or party to the Arbitration Agreement. Although non-signatories can enforce an arbitration agreement is certain very limited circumstances, none of those circumstances are applicable here. ESPN does not "dominate or control" Atlantic Video, but merely uses Atlantic Video as a contractor. This is not remotely sufficient to allow ESPN to enforce an agreement to which it is not a party and not a beneficiary.

## BACKGROUND FACTS

1. **Circumstances of Ms. Ragone Being Hired By Defendant Atlantic Video**

Rita Ragone is a former employee of Defendant Atlantic Video, having been employed by Atlantic Video from February 28, 2005 until April 11, 2006, as a makeup artist. Complaint, ¶ 11. Ms. Ragone was hired by Atlantic Video as a make-up artist for one of Atlantic Video's significant clients, Defendant ESPN. Specifically, Ms. Ragone was hired to provide make-up artistry and other services to ESPN's Cold-Pizza talent. Complaint, ¶ 13, Cold Pizza was a television morning sports talk show that aired on ESPN2 and was taped live from Atlantic Video's studio at the Manhattan Center in New York, NY. The show was hosted by Dana Jacobson and Jay Crawford. Other talents on the show include Skip Bayless and Woody Paige, who served as panelists for the *1st and 10* segment of the show.

Ms. Ragone has a high school Degree, but does <u>not</u> have any college or higher education degrees. She has no experience in business or human resources. Ragone Aff., ¶ 3. Prior to becoming employed with Atlantic Video, Ms. Ragone was providing make-up artist services on

a free-lance basis.   She did not have full time gainful employment at the time, and she

desperately needed a permanent position. <u>Id</u>. ¶ 4.   Ms. Ragone learned of the opportunity at

Atlantic Video through a friend and applied for the position. <u>Id</u>., ¶ 5.

     Atlantic Video first brought Ms. Ragone in to its production facility to audition her make-

up artist skills.   She was told they would get in touch with her.   Atlantic Video then brought her

in for a second audition.   At the conclusion of this second session, Ms. Ragone was instructed to

meet with manager Ted Nelson at the corporate offices. <u>Id</u>., ¶¶ 6-7.

     Ms. Ragone went to Mr. Nelson's office and was told that she would be starting next

week but that she had to sign some documents that were placed in front of her.   Ms. Ragone was

told to sign them right then and there if she wanted to be hired and begin work. <u>Id</u>., ¶ 8.

     Ms. Ragone was not given any opportunity whatsoever to take the documents home with

her and review them carefully before signing them.   No one from Atlantic Video told that Ms.

Ragone that she should have the documents reviewed by an attorney, and she was not given any

opportunity to have them reviewed by an attorney prior to signing them. <u>Id</u>., ¶ 9.

     No one told Ms. Ragone what was the purpose or contents of the documents placed

before her were, and nobody explained or described any of terms in the documents that she was

instructed to sign. <u>Id</u>., ¶ 10.

     There was absolutely no opportunity to discuss or negotiate any of the documents that

Ms. Ragone was instructed to sign.   They were simply placed before her, and she was told to

sign them immediately so that she could be hired and start her job duties.    It was obvious and

clear from Mr. Nelson that the documents placed before her were given to Ms. Ragone on "take

it or leave it basis" and that she had to sign them right then immediately in order to be hired. <u>Id</u>.,

¶ 11.

Ms. Ragone quickly leafed through the documents placed before her as Mr. Nelson was standing right there waiting impatiently for her to sign them. She did not have the opportunity to read any of the documents placed before her carefully and did not really understand any of the terms of the documents. Ms. Ragone was not given any of the documents to take home with her. Id., ¶ 12.

Ms. Ragone did not sign the purported Arbitration Agreement. Ms. Ragone has reviewed the Arbitration Agreement that Mr. Calli says he found in her personnel file, but does not believe that she ever saw or signed the document. The only document Ms. Ragone recalls being placed before her was an employment contract. The signature on the purported arbitration agreement document is either a forgery or was transposed. Id., ¶ 13.

Atlantic Video has not produced or made available the purported original of the Arbitration Agreement and Ms. Ragone (or her counsel) has had no opportunity to have any such purported original reviewed or analyzed by a handwriting expert. See Calli Aff., Exh. A.

Moreover, there are several important aspects of the document that, just by looking at it, lead Ms. Ragone to believe that she did not sign the Arbitration Agreement. First, the printed portion of Ms. Ragone's name does not look like her handwriting at all. Ms. Ragone prints her name in an entirely different fashion. Ragone Aff., ¶¶ 15-16.

Second, it is clear from the face of the document that it was not a finalized document at all, but some type of transitional draft of an agreement. The Arbitration Agreement very clearly has computer edits on it in the upper right hand corner that show it was in the process of being edited and modified. See Calli Aff., Exh. A. Ms. Ragone would have noticed and recalled if she have been given a draft, non-finalized document to sign that still had computer edits on it, and

she is sure that she did not do so.  Ms. Ragone would at the very least have pointed it out to Atlantic Video that they had mistakenly given her an edited draft. ¶ 17.

## II.    Ms. Ragone Is Subjected To Pervasive Sexual Harassment And Is Discharged In Retaliation For Her Complaints

During her employment with Atlantic Video, Ms. Ragone created looks for and worked with Dana Jacobson, Jay Crawford, Skip Bayless and Woody Paige (among others). Complaint, ¶ 15.  Ms. Ragone always conducted herself in a professional manner and went above and beyond in her job duties to ensure that ESPN's Cold Pizza talent was fully prepared for airtime.  Besides providing makeup services, she offered skincare advice to the Cold Pizza talent, performed a variety of special effects work for the show, calmed the Cold-Pizza talent before air-time with aromatherapy, music, flowers, etc…., and took all necessary measures to ensure that her talent was on the set early every day.  Complaint, ¶ 16.

In the course of Ms. Ragone's job duties, she reported to Atlantic Video General Manager Ted Nelson, as well as to Ed Brancaccio and Douglas Sherman of Atlantic Video.  Ms. Ragone was also required to follow the instructions and directives of ESPN talent and ESPN supervisors on the set, including Dana Jacobson, Jay Crawford, Skip Bayless, Woody Paige and Lori Berlin (Director of Production – ESPN).  Complaint, ¶17.

Almost immediately after Ms. Ragone commenced her employment with Atlantic Video for ESPN Cold Pizza, she became the victim of severe, pervasive and continuous sexual harassment by Cold Pizza talent Woody Paige and Jay Crawford. Complaint, ¶ 18.

The sexual harassment Ms. Ragone endured during almost her entire length of employment with Atlantic Video for ESPN Cold Pizza was pervasive and open.  ESPN supervisors and other ESPN Cold Pizza talent repeatedly witnessed the sexual harassment and condoned the repulsive behavior of Defendants Paige and Crawford.  Complaint, ¶ 19.  In fact, it

7

was apparent to Ms. Ragone that Defendants Paige and Crawford had engaged in similar sexual harassment towards many other females on the set and that such behavior was not only ignored, but considered humorous by Atlantic Video and ESPN management.  Complaint, ¶ 20.

The severity and pervasiveness of the continuous sexual harassment by Defendants Paige and Crawford made Ms. Ragone's work environment hostile, abusive and intolerable, eventually causing Ms. Ragone to complain on numerous occasions to both Atlantic Video and ESPN management employees about the behavior. Complaint, ¶ 21.

The sexual harassment by Defendants Paige and Crawford was both verbal and physical. Complaint, ¶ 22.  For instance, Defendant Paige grabbed Ms. Ragone's buttocks on at least three occasions in a most sexually offensive and obscene manner.   On one occasion, Defendant Paige grabbed her butt so forcefully, Ms. Ragone, quite startled, was propelled forward and into the air. Complaint, ¶ 23.

Defendant Paige laughed when Ms. Ragone looked at him in disgust and stated "Hey, quit it".  Numerous Cold Pizza talent was in the room when this incident occurred. Complaint, ¶ 24.

In addition, Defendant Paige would often come up behind Ms. Ragone while she was working or in a conversation with another individual, wrap his arm around her waist and slowly drop his hand down her back towards her buttocks.  Ms. Ragone would quickly remove Mr. Paige's hand before he could grab her in the buttocks area.  Complaint, ¶ 25.

Ms. Ragone repeatedly told Defendant Paige he was acting inappropriate and to stop it, but his sexually offensive gestures and behavior continued.   Complaint, ¶ 26.  .Frequently throughout her employment, Defendant Paige grabbed and/or rubbed Ms. Ragone's thigh. Complaint, ¶ 27.

On several occasions, Ms. Ragone told Defendant Paige to "stop" or "quit it" and to let her do her job.  Nevertheless, the thigh-grabbing/rubbing did not stop. Complaint, ¶ 28.  On other occasions, Defendant Paige would stroke Ms. Ragone's hair in a sexual manner.  Complaint, ¶ 29.

Ms. Ragone constantly pleaded with Defendant Paige to stop his behavior and was often forced to physically remove Defendant Paige's hand(s) from various parts of her body. Complaint, ¶ 30.

Defendant Paige often displayed anger or rage towards Ms. Ragone when she refused his advances or asked him to stop his behavior.   He was sometimes yell or scold Ms. Ragone and tell her she had no talent after she rejected his advances.  Complaint, ¶ 31.

The physical sexual harassment towards Ms. Ragone also came from Jay Crawford. Complaint, ¶ 32. One time, Mr. Crawford physically confronted Ms. Ragone, breathing on her and forced her into a corner of the room, while telling Ms. Ragone that "he wanted her". Complaint, ¶ 33.  Ms. Ragone was extremely frightened and appalled by Defendant Crawford's behavior. Complaint, ¶ 34.

Although it was stressful, embarrassing and mentally exhausting for Ms. Ragone to continue working in this type of an environment, she continued to perform her job duties in an exemplary manner and always acted professionally towards her co-workers and the ESPN talent. Complaint, ¶ 35.

The sexual harassment at Atlantic Video's Manhattan studio and on the Cold Pizza set was not just physical, but verbal as well.  Ms. Ragone was also exposed to vulgar and obscene sexual proposals on a _daily_ basis during her employment.  The sexual proposals by Defendant Paige and/or Defendant Crawford included (although are not limited to:

a)      "wanna make out?";

b)      "wanna f*ck?";

c)      "wanna see what's in my pants?";

d)      "guess what color my cock is?";

e)      "can you give me a hand job today?"; and,

f)      "I want you".

Complaint, ¶ 36.

In addition, Ms. Ragone was exposed to particularly obscene, dirty jokes by Defendants Paige and Crawford.  These jokes often involved explicit references to woman's breasts or male genitalia.  Complaint, ¶ 37.

One the most humiliating experiences during Ms. Ragone's employment involved Defendant Woody Paige.  Defendant Paige was having a conversation with two (2) other gentleman in the studio.  When Ms. Ragone entered the room, Defendant Paige remarked to the other men, "Rita looks like she's really good at giving blow jobs".  The other men laughed and then after repeating this vulgar comment a second time, Defendant Paige then remarked, "Imagine that face between your legs".  This incident occurred in or about October 2005.  Complaint, ¶ 38.

Defendant Paige would also frequently ask Ms. Ragone to "sit right here", while tapping his hand on his lap and near his genital area. Complaint, ¶ 39.

One time Defendant Paige asked Ms. Ragone "Do you think I have a big one because I'm a big guy?"  Complaint, ¶ 40.

After Defendant Paige had a vasectomy, he stated to Ms. Ragone on several occasions, "why don't you take a look at my black balls". Complaint, ¶ 41.  In fact, Defendant Paige talked

about his genitals frequently in the studio and often stated loudly, "cocks and balls". Complaint, ¶ 42.

On many occasions throughout her employment, Ms. Ragone found Defendant Paige staring at her. Complaint, ¶ 43. Defendant Paige also did not hesitate to compliment Ms. Ragone and tell her that she was beautiful. Complaint, ¶ 44.

On one occasion when Ms. Ragone was working with a client, Defendant Paige removed his pants in his office, with his door wide open, put on a new pair of boots and proceeded to walk out of his office. Ms. Ragone asked him to keep his office door shut. Defendant Paige laughed and continued in his behavior. Complaint, ¶ 45.

Defendant Crawford also verbally sexually harassed Ms. Ragone. Complaint, ¶ 46. Defendant Crawford frequently called Christine (the hair stylist) a "stinky slut whore" and told Ms. Ragone that she was "different" and that "he wanted her". Complaint, ¶ 47.

Defendant Crawford continuously made comments about Ms. Ragone's lips or mouth. Complaint, ¶ 48. On one occasion, Defendant Crawford stated to Ms. Ragone, "I don't care if you can do makeup or not…the only reason that you got the job here is because you're hot". Complaint, ¶ 49.

The sexually offensive behavior by Defendants Paige and Crawford was most severe when other female employees joined in, including Christine and Britney of the hair and wardrobe department. Complaint, ¶ 50. Christine would often sit on Defendant Paige's lap or the laps of other ESPN talent. Following this, Defendant Paige would come after Ms. Ragone to engage in similar flirtatious behavior. Complaint, ¶ 51. When Ms. Ragone refused to engage in such behavior, Defendant Paige became visibly upset. Complaint, ¶ 52.

One time Defendant Paige even told Ms. Ragone that she was "ruining everything".  Ms. Ragone took this comment to mean that because she wouldn't flirt with him and did not play into Defendants' sexually charged atmosphere that she was not considered a "team player". Complaint, ¶ 53.

The flirtatious behavior between Christine and Britney and Defendants Paige and Crawford was no secret and this type of behavior was witnessed by various ESPN talent, ESPN supervisors and was known to Atlantic Video managers. Complaint, ¶ 54.  Sometimes, while sitting on Defendant Paige's lap, Christine would give him lap dances.  Complaint, ¶ 55.

Christine would often yell in the studio, "tits out everybody", which always encouraged additional sexual comments out of Defendant Paige and Defendant Crawford's mouths. Complaint, ¶ 56. Defendants Paige and Crawford would also laugh about and discuss the promiscuous clothing of Christine and Britney, focusing their discussions on their breast area. Complaint, ¶ 57.

On one occasion when Fabio was a guest on the show, Christine pulled her breast out of her shirt and placed her breast in Fabio's hand. Complaint, ¶ 58.

Ms. Ragone had never worked in such a vulgar and obscene environment.  Never before had she been confronted with such severe physical and verbal sexual harassment that was tolerated and condoned by her supervisors and managers.  Complaint, ¶ 59.  Although Ms. Ragone contemplated leaving her employment on many occasions due to the continued sexual harassment, her mother's health condition made it difficult for her to leave her job without first giving both Atlantic Video and ESPN an opportunity (several opportunities) to correct this atmosphere.   Complaint, ¶ 60.

Ms. Ragone's mother suffers from severe chronic obstructive pulmonary disease, chronic bronchitis and other health problems. In the past year, her mother had suffered two (2) strokes and Ms. Ragone almost lost her mother. Ms. Ragone was dependent upon the steady income from her employment with Defendants to care for her mother. Complaint, ¶ 61.

Therefore, Ms. Ragone elected not to remain quiet about the sexually charged atmosphere at Atlantic Video's Manhattan studio on the Cold Pizza set and lodged numerous complaints to both Atlantic Video and ESPN management in an effort to put an end to the sexual harassment. Complaint, ¶ 62.

Ms. Ragone expressed openly her frustration and unhappiness with the behavior of Defendants Paige and Crawford at the studio. Lori Berlin, ESPN Director of Production, was fully aware that Ms. Ragone had asked Defendants Paige and Crawford to stop the sexual harassment, that she constantly pleaded with Ms. Berlin to do something about their behavior, that Ms. Ragone was frustrated with their continued sexual harassment, and was even aware that Ms. Ragone had multiple conversations with the hair and wardrobe department about the current work environment being intolerable and extremely offensive to her and their contributions to this atmosphere. Complaint, ¶ 63.

Nevertheless, Ms. Berlin ignored Ms. Ragone's discussions about the sexually charged atmosphere in the studio and dismissed her daily objections to this environment. Complaint, ¶ 64. Further, on other occasions, Ms. Berlin remarked that Paige and Crawford were "untouchable". Complaint, ¶ 65.

Ms. Ragone's complaints did stop with Ms. Berlin. Complaint, ¶ 68. In or around October 2005, Ms. Ragone requested a meeting with Ted Nelson of Atlantic Video to discuss the

sexual harassment by Defendants Paige and Crawford at Atlantic Video's Manhattan studio.

Complaint, ¶ 69.  The project manager, Eliza, was a witness to this meeting.  Complaint, ¶ 70.

Mr. Nelson was not very receptive to Ms. Ragone's concerns.  Mr. Nelson often cut Ms.

Ragone off while she was speaking and even suggested at one point that she "keep quiet" about

what was going on.  Complaint, ¶ 71.  Without any alternative, Ms. Ragone returned to work.

Complaint, ¶ 72.

One month after Ms. Ragone's first complaint to Mr. Nelson, due to the continued severe

sexual harassment in the studio, Ms. Ragone complained a second time to Mr. Nelson.  During

this meeting, Ms. Ragone went into extreme detail about all of the sexually offensive touching,

grabbing, jokes, discussions, proposals and remarks made to her by Defendants Paige and

Crawford.  She also complained about Ms. Berlin's failure to  correct any of this behavior.

Complaint, ¶ 73.

During this meeting, Ms. Ragone also raised an issue over a raise she had been

previously promised.  Complaint, ¶ 74.   In response, Mr. Nelson stated that Ms. Ragone's raise

was revoked (with other perks she was previously allowed on the job when she first started).

Complaint, ¶ 75.

Mr. Nelson then told Ms. Ragone to "stop rocking the boat", to go back to doing her job

and that he did not want to talk about the sexual harassment anymore.  Complaint, ¶ 76.  Mr.

Nelson did state that Mr. Paige had been suspended for similar incident and that Ms. Ragone had

no reason to worry from this point forward if she kept quiet.  Complaint, ¶ 77.

Defendants Paige and Crawford were aware of Ms. Ragone's complaints.  In fact, even

Lori Berlin was publicly discussing Ms. Ragone's complaints.  Complaint, ¶ 78. Defendants

Paige and Crawford laughed at Ms. Ragone's complaints and further told her that they never

14

took the sexual harassment course in Bristol, CT, and; therefore, that they could be held responsible for their actions.  Complaint, ¶ 79.

Ms. Ragone was made to feel by Ms. Berlin, as well as Defendants Paige and Crawford, as though everyone was laughing at her behind her back due to her complaints and that no one at either ESPN or Atlantic Video would ever take her seriously. Complaint, ¶ 80.  Also, following Ms. Ragone's complaints, Ms. Berlin began treating Ms. Ragone differently and Defendants Paige and Crawford became particularly hostile towards Ms. Ragone. Complaint, ¶ 81.

Prior to Ms. Ragone's complaints, she had never been written up, disciplined, reprimanded or suspended. Complaint, ¶ 82   To the contrary, Ms. Ragone had received numerous compliments, not only from Atlantic Video personnel, but ESPN talent. Complaint, ¶ 83.

However, following Ms. Ragone's complaints about the sexual harassment she was being exposed to at Atlantic Video's Manhattan studio by ESPN talent, Ms. Ragone was issued her very first write-up, dated March 10, 2006, due to a false complaint lodged against her by Lori Berlin.  Complaint, ¶ 84

In this write-up, Ms. Ragone is accused of talking on her cell phone while guests are in the chair and making them wait until she is finished with her phone call.  Complaint, ¶ 85.  This write-up is completely false and was issued in retaliation for Ms. Ragone's complaints about the sexually charged atmosphere that Ms. Berlin allowed to exist on the Cold Pizza set.  Complaint, ¶ 86.

In fact, Ms. Ragone indicated on this write-up (when asked to acknowledge same), that she was signing the write-up in protest and that the only time she took any calls was for emergent calls relating to her ill mother.  Complaint, ¶ 87.

Ms. Ragone spoke to Edward Brancaccio of Atlantic Video about this write-up, informed him that she found it to be retaliatory and that Atlantic Video could check the video-tapes of her station, which would prove that she was not on her cell phone during the times in question nor did she frequently talk on her cell phone and keep guests waiting while doing so. Complaint, ¶ 88.

Mr. Brancaccio did investigate and informed Ms. Ragone that the video-tapes revealed she was not on the phone when Ms. Berlin accused her of being on her cell phone. He assured Ms. Ragone that the disciplinary action would be removed from her file and that her job with Atlantic Video was secure. Complaint, ¶ 89.

Despite Mr. Brancaccio's reassurance, Ms. Ragone requested a meeting with Mr. Brancaccio and Mr. Nelson, to discuss not only the continued sexual harassment, but the retaliation she was experiencing particularly from Ms. Berlin since her complaints. Ms. Ragone was told that a meeting would be arranged when Mr. Nelson returned from being out of the office. Complaint, ¶ 90.

However, this meeting never took place. Instead, shortly after Ms. Ragone's conversation with Mr. Brancaccio, on April 7, 2006, at approximately 6:00 p.m., Ms. Ragone received a telephone call from Mr. Nelson, who was in Washington, D.C., during which he fired Ms. Ragone. Complaint, ¶ 91.

Ms. Ragone demanded to know the reason why she was being fired. Complaint, ¶ 92. In response, Mr. Nelson stated "because you don't even known how to f*ckin work when you're there"…."Lori and Dana said you were soliciting work". Complaint, ¶ 93.

Ms. Ragone assured Mr. Nelson that this was completely false. Complaint, ¶. 94. Then, Mr. Nelson stated to Ms. Ragone, "you're a liability". Complaint, ¶ 95.

Ms. Ragone immediately called Mr. Brancaccio about her conversation with Mr. Nelson. Mr. Brancaccio stated that he had no knowledge that Mr. Nelson was going to fire her and further stated to her that Lori and others were after her due to her complaints about the sexual harassment.  Complaint, ¶ 96.

Ms. Ragone has never received any formal notice of her termination or a written explanation for her termination.  Complaint, ¶ 97.

## LEGAL ARGUMENT

## I.    THE ARBITRATION AGREEMENT IS UNCONSCIONABLE

It is well established that under both the FAA and New York law, "a party may resist enforcement of an agreement to arbitrate on any basis that could provide a defense to or grounds fro the revocation of any contract, including fraud, unconscionability, duress, overreaching conduct, violation of public policy, or lack of contractual capacity." Matter of Arbitration Between Teleserve Systems, Inc. and MIC Telecommunications Corporation, 659 N.Y.S.2d 659, 663 (N.Y.A.D. 4th Dept. 1997)

Accordingly, an arbitration agreement is not enforceable when it is unconscionable.  See Gillman v. Chase Manhattan Bank, 73 N.Y.2d 1, 10 (1988).  An arbitration agreement is unconscionable where there is "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." Id.  In New York, unconscionability generally requires both procedural and substantive elements. Id.  In determining whether a contract is unconscionable, a court should take a "flexible" approach, examining "all the facts and circumstances of a particular case." Id.

## A    Substantive Unconscionability

An arbitration agreement is substantively unconscionable where its terms are unreasonably favorable to the party against whom unconscionability is claimed. See Desiderio v. National Association of Securities Dealers, Inc., 191 F.2d 198, 207 (3rd Cir. 1991) Brennan v. Bally Total Fitness, 198 F.Supp.2d 377, 382 (S.D.N.Y. 2002).  "Substantive elements of unconscionability appear in the context of the contract per se." Matter of Friedman, 407 N.Y.S.2d 999, 1008 (N.Y.A.D. 1978).

The United States Supreme Court has well established that, although statutory claims are subjection to arbitration agreement,  "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26 (1991), quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985).

Contrary to the Supreme Court's admonishment in Gilmer, the Arbitration Agreement that Defendants seek to impose in this matter sets forth numerous unconscionable provisions that most definitely force Ms. Ragone to "forgo the substantive rights afforded by the statutes" that she is suing under, i.e. Title VII, the NYHRL, and the NYCHRL.

### 1.    Shortening of Arbitral Forum Statute of Limitation to 90 Days

The Arbitration Agreement impermissibly vitiates Ms. Ragone's statutory rights by shortening her statute of limitations to only 90 days.  See Calli Aff.. Exh. A, ¶ 4.

There is no dispute that the limitations periods for filing a Charge of Discrimination under Title VII in New York is 300 days. 42 U.S.C. 2000e-5(e)(1).   The statute of limitation of claim under the New York State Human Rights Law is one (1) year. NY Executive Law, § 297(5).  The statute of limitations under the New York City Human Rights Law is three (3)

years. NYC Code, § 8-502(d).   The substantive rights afforded by these statutes of limitations are completely abrogated by the Arbitration Agreement, which states:

> "I understand, acknowledge and agree that I must submit my written arbitration demand to AAA at its New York offices **no later than ninety (90) calendar days after my claims arises** or it **will** be conclusively resolved against me **even if there is a statute of limitations that may have give me time**. Calli Aff., Exh. A., ¶ 4. (emphasis added).

Accordingly, even though it is undisputed that Ms. Ragone has complied with all the statute of limitations periods applicable under Title VII, the NYSHRL, and the NYCHRL, an arbitrator will nevertheless be <u>required</u> under the express language of the Arbitration Agreement <u>to dismiss</u> Ms. Ragone's statutory cause of action in its entirety.   In short, **in seeking to compel the *arbitration* of Ms. Ragone claims, the Defendant are in reality seeking the <u>dismissal</u> of these claims.**   This is the height of overreaching, oppressiveness, and unconscionability.

It cannot reasonably be denied that the grossly shortened limitation period in the Arbitration Agreement runs totally afoul of the Supreme Court's ruling that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." <u>Gilmer v. Interstate/Johnson Lane Corp.</u>, 500 U.S. 20, 26 (1991).  In this case, by sending Ms. Ragone's claims to an arbitral forum, as opposed to their remaining in court, she will be "foregoing" the right to even *assert* her statutory claims as they will be dismissed as untimely under the Agreement's 90 day limitations period.

Courts that have faced similar arbitration provisions substantially shortening the applicable statute of limitations have not hesitated to find them unconscionable and unenforceable.  See <u>Parilla v. IAP Worldwide Services VI, Inc.</u>, 368 F.3d 269 (3rd Cir. 2004) (30

day notice provision in employment arbitration agreement is unconscionable); <u>Alexander v. Anthony International, L.P.</u>, 341 F.3d 256 267 (3rd Cir. 2003) (30 day notice provision in employment arbitration agreement is unconscionable); <u>Ingle v. Circuit City Stores, Inc.</u>, 328 F.3d 1165, 1175 (9th Cir. 2003) (shortened one year limitation period held unconscionable and unenforceable); <u>Circuit City Stores, Inc., v. Adams</u>, 279 F.3d 889, 894 (9th Cir.) <u>cert. den</u>. 535 U.S. 112 (2002) (shortened one year statute of limitations held unenforceable); <u>Plaskett v. Bechtel International, Inc.</u>, 243 F.Supp.2d 334, 341 (D. Vi. 2003) (a requirement to notify the employer "within thirty days of the event forming the basis of the claims with the further qualification that such limitation be strictly enforced" is unreasonable); <u>Lucey v. FedEx Ground Package Systems, Inc.</u>, 2007 WL 3052997, *7 (D.N.J. 2007)(90-day statute of limitation held unconscionable and unenforceable).

Furthermore, it is important to note that the grossly shortened limitations period in the Arbitration Agreement is entirely <u>one-sided</u>. There is <u>no</u> shortened limitation whatsoever on the *Defendant's* time to assert any claims it may have against Ms. Ragone. See Calli Aff., Exh. A, ¶ 4. This further substantively adds to the unconscionability and oppressiveness of the Arbitration Agreement. <u>See</u> <u>Alexander</u>, 341 F.3d at 267 ("Such an unfair advantage is only compounded by the fact that [defendant] is apparently not required to provide detailed and written notice to an employee of any of its own claims within a strictly enforced thirty-day time period. We therefore find that the thirty-day time restriction is substantively unconscionable")

### 2. Fee Shifting Provision

The Arbitration Agreement provides:

"I understand, acknowledge, and agree that in the event that I initiate arbitration hereunder, and/or challenge the validity of this Agreement, the prevailing party **shall** be

entitled to all reasonable costs and outside and in-house attorney's fees arising from said

action." (emphasis added). Calli Aff., Exh. A. ¶ 9.

This provision renders the Arbitration Agreement unconscionable as it fundamentally alters Ms.

Ragone's statutory rights and common law rights by requiring the imposition on her of an

untenable and undue financial burden that she would <u>not</u> be exposed to in a court of law.

<u>1.    Defendant Recovers Attorneys Fees In Arbitration If It Prevails</u>

The arbitration agreement <u>requires</u> that Ms. Ragone pay for Atlantic Video's "outside and

in-house attorneys fees" arising from an arbitration proceeding if Atlantic Video is the

"prevailing party."  The term "prevailing party' is not definitionally limited in Agreement in any

way.   In short, under the express language of the Agreement, Ms. Ragone "shall" be held liable

for all of Defendants attorney fees simply on the basis that an arbitrator concluded that her

claims had no merit.  This is contrary to Ms. Ragone's substantive statutory rights under both

Title VII and the New York City Rights Law in several ways.

*<u>First</u>*, the Agreement is contrary to the established law that a *<u>Defendant</u>* in a civil rights

lawsuit is entitled to attorney fees **only** if it is determined that the claim "was frivolous,

unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so."

<u>Christiansburg Garment Co. v. Equal Employment Opportunity Commission</u>, 434 U.S. 412,  422

(1978); <u>LeBlanc-Sterberg v. Fletcher</u>, 143 F.3d 765, 769-70 (2nd Cir. 1998).  A plaintiff <u>cannot</u>

be exposed to the defendant's attorney fees simply because he or she did not "finally prevail."

<u>Christiansburg Garment</u>, at 422. ("To take the further step of assessing attorney's fees against

plaintiffs simply because they do not finally prevail would substantially add to the risks inhering

in most litigation and would undercut the efforts of Congress to promote the vigorous

enforcement of the provisions of Title VII").  The four corners of the Arbitration Agreement do

not impose or provide any such requisite limitation on Defendant's ability to recover attorney fees only in the event that the claim is found to be frivolous, unreasonable, or groundless", and on the contrary, require the imposition of fees simply on the basis that Ms. Ragone not "finally prevail."

Not only does the Agreement thus substantively detrimentally alter Ms. Ragone's statutory rights, as a practical matter it makes it impossible for her to proceed to assert her claims. If Ms. Ragone does not prevail on her claims, under the language of the Agreement, she will be exposed to pay literally hundreds of thousands of dollars in liability to Defendant for attorney fees. This is precisely the type of "chilling effect" on civil rights suits that is prohibited. LeBlanc-Sterberg ,143 F.3d at 70 ("In order to avoid chilling the initiation and prosecution of meritorious civil rights actions, fees are not to be awarded to a prevailing defendant unless the plaintiff's action was 'frivolous, unreasonable, or groundless, or ... the plaintiff continued to litigate after it clearly became so'").

More to the point, the imposition of this extensive financial burden on Ms. Ragone in arbitration, which would not be imposed in court, is precisely the type of unconscionability and violation of public policy that renders an arbitration provision void and unenforceable. Martens v. Smith Barney, Inc., 181 F.R.D. 243, 255-256 (S.D.N.Y. 1998). In Martens, the court made clear that "the arbitration agreement cannot impose financial burdens on plaintiff's access to the arbitral forum." Id. "This principle bars not only 'steep filing fees,' but also 'fee-shifting' agreements in which plaintiffs pay part of the arbitrators fee" Id. In this case, the arbitration agreement does much worse than simply shift to Ms. Ragone liability for the *arbitrator's* fee; it shifts to Ms. Ragone liability *to Defendants* themselves for potentially hundred of thousands of dollars.

_Second_, the above language in the Arbitration Agreement also substantively alters Ms. Ragone statutory rights by making the imposition of attorneys fees to the "prevailing party" <u>mandatory</u> rather than discretionary.  In contrast, both Title VII and the New York City Civil Rights Law leave the awarding of attorneys fees to the "discretion" of the court.  42 U.S.C. 2000e-5(k); NYC Code, § 8-502(f).

The practical effect is that Ms. Ragone's exposure to extensive financial liability is effectively determined by _whether_ her claims proceed in court or in arbitration.  _In court_, the judge would have discretion to decline to award Defendant any attorneys fees under the totality of the circumstances.  _In arbitration,_ under the precisely the same circumstances, the arbitrator would <u>not</u> have to discretion to decline awarding attorneys fees to Defendant, but would be <u>required</u> to do so.

Moreover, Ms. Ragone is substantively disadvantaged and prejudiced _even if_ an Arbitrator finds that Defendant is entitled to attorney fees only if Ms. Ragone's claims was frivolous or groundless.   In court, Ms. Ragone can <u>avoid</u> liability for hundreds of thousands of dollars in attorney fees under the courts' discretion _even if_ the court finds her claims were "groundless."   Again, the arbitrator has no such discretion.  It is impermissible for an arbitration agreement to create this type of substantive disparity in the statutory rights and liabilities of a party compared to proceedings in court.  <u>E.E.O.C. v. Waffle House, Inc.</u>, 534 U.S. 279, 296 n. 10 (2002)("We have held that federal statutory claims may be the subject of arbitration agreements that are enforceable pursuant to the FAA because the agreement only determines the choice of forum" but a "party does not forgo the substantive rights afforded by the statute"); <u>Bird v. Shearson Lehman/American Exp., Inc.</u>, 926 F.2d 116, 120-121 (2nd Cir. 1991) ("arbitration is

inconsistent with the underlying purposes of a statute where arbitration is inadequate to protect the substantive rights at issue") (internal quotations omitted).

The court decision in <u>DeGaetano v. Smith Barney, Inc.</u>, 983 F.Supp. 459 (S.D.N.Y. 1997) is instructive. At issue was whether an arbitration provision denying a successful Title VII plaintiff the right to attorneys fee was enforceable. The court cited approvingly to D.C. Circuit's decision in <u>Cole v. Burns Int'l Sec. Servs.</u>, 105 F.3d 1465 (D.C. Cir. 1997) to the effect that "<u>Mitsubishi</u> and <u>Gilmer</u> impos[ed] a broad ban on arbitration agreements that prevent plaintiffs from securing all of the rights and remedies available under a statutory claim." <u>DeGaetoano</u>, 983 F.Supp. at 468. The court further cited approvingly to the following language from <u>Cole</u>:

> "Gilmer cannot be read as holding that an arbitration agreement is enforceable no matter what rights it waives or what **burdens it imposes**… The beneficiaries of public statutes are entitled to the rights **and protections provided the law**. <u>Id</u>. quoting <u>Cole</u>, 105 F.3d at 1482. (emphasis added).

Based on these authorities the court concluded as follows: "contractual clauses purporting to mandate arbitration of statutory claims as a condition of employment are enforceable only to the extent that the arbitration preserves the **substantive protections and remedies** afforded by the statute…" <u>DeGaetoano</u>, 983 F.Supp. at 469. (emphasis added). Finding that the right to attorneys fees is a substantive, the court concluded that an arbitration provision that precludes attorneys fees to a successful plaintiff in a Title VII case ran afoul of this basic principle, and therefore was unenforceable. <u>Id</u>.

Although in a slightly different context, precisely the same analysis is required here. A Title VII plaintiff's <u>protection</u> against paying Defendants' attorney fees unless her claim was frivolous or groundless is a <u>substantive right and protection</u> afforded by the law that cannot be

abrogated by an arbitration provision. See LeBlanc-Sterberg ,143 F.3d  at 70. See also

Armendariz v. Foundation Health Psychcare Services, Inc., 24 Call.4th 83 (2000)("it is not only

the costs imposed on the claimant but the *risk* that the claims may have to bear substantial costs

that deters the exercise of constitutional right of due process" and therefore "imposition of

substantial forum fees… are grounds for invalidating…an arbitration agreement').

On point is the New Jersey Supreme Court's recent decision and analysis in Delta

Funding Corporation v Harris, 189 N.J. 28 (2006). At issue was the unconscionability of an

arbitration clause in a mortgage loan contract between a consumer and sub-prime lender.  The

arbitration provision provided that "at the conclusion of the arbitration, the arbitrator will decide

who will ultimately be responsible for paying the filing, administrative, and/or hearing fees in

connection with the arbitration." Id. at 41.  The court began its analysis by noting that "[i]t is

well understood that fee-shifting provisions can deter a litigant from pursuing a claim." Id. at 42.

The court found that "[a]lthough the public policy of our State would permit an arbitration

agreement to shift costs and attorney's fees to a consumer who brings 'frivolous' or 'bad faith'

claims…, no such limitation is evident in the cost-shifting provisions applicable to [plaintiff]."

Id. at 42-43  The court rejected Delta's argument that arbitrators "rarely" shift costs to consumers

because "contract unconscionability must be decided based **on the contract as written** because

the language of the agreement is what consumers must consider when assessing whether to

pursue a statutory rights claim." Id. (emphasis added).  The court concluded that "[t]the

agreement as written, and as yet uninterpreted by an arbitrator, could force [plaintiff] to bear the

risk that she will be required to pay all arbitration costs.  That risk is unconscionable in that it is a

deterrent to the vindication of her statutory rights." Id. at 43.

<u>Precisely</u> the same is true in this matter. There is no "limitation evident" in the arbitration agreement shifting liability for Defendant's legal fees to Ms. Ragone <u>*only*</u> in the event she filed a "frivolous" or "groundless" claim. The "agreement as written… could force [Ms. Ragone] to bear the risk that she will be required to pay" all of Defendant's legal fees even in the *absence* of filing a frivolous claim. This is clearly a "deterrent to the vindication of her statutory rights" and therefore unconscionable.

Also on point is the Second Circuit's opinion in <u>Brooks v. Travelers Insurance Co.</u>, 293 F.3d 167 (2002). The defendant in <u>Brooks</u> won its motion to compel arbitration in lower court, but then abandoned seeking arbitration in the face of the appellate panel's "concerns" at oral argument whether the arbitration provisions "could impair a plaintiff's ability to vindicate statutory rights." <u>Id</u>. at 170. One of the court's concerns was that the arbitration clause that the forbid "punitive damages, injunctive relief and attorney's fees '[u]nless expressly provided for by applicable statute.'" <u>Id</u>. The court noted:

> "The third sentence, for example, makes a plaintiff's entitlement to an arbitral award of injunctive relief or punitive damages depend on whether such relief is 'expressly' provided for by the applicable statute. A statute might be silent or ambiguous on the availability of punitive damages or injunctive relief, but might be authoritatively interpreted by courts to provide for such relief. In such circumstances, Travelers' arbitration policy would appear to forbid relief that federal courts would grant, because the relief is not '*expressly*' provided for by the applicable statute."

<u>Id</u>. at 171. (emphasis in original).

This is precisely the problem that faces Ms. Ragone, and addresses any argument by Defendant that the Arbitration Agreement merely follows the language of Title VII and the New York City

Human Rights Law.   First, the language in the Arbitration Agreement in this case is even narrower and more limited than in <u>Brooks</u> because it does not state that arbitrator has to follow an "applicable statute" in awarding attorneys fees, but only that he "shall" award attorney fees to the "prevailing" party.   In short, unlike in <u>Brooks</u>, there is nothing in the arbitration language at issue here that requires the arbitrator to follow the substantive law of Title VII or the New York City Human Rights Law in determining attorneys fees.

Even if this were implied, however, the court's concerns in <u>Brooks</u> still apply with equal force.   Both Title VII and the New York City Right Law simply state that courts have discretion to award attorney fees to the "prevailing party."   42 U.S.C. 2000e-5(k); NYC Code, § 8-502(f). The <u>literal</u> language of these statutory provisions, however, is <u>incomplete and misleading</u> because they have been "authoritatively interpreted by courts to provide" that a prevailing <u>defendant</u> can only recover attorneys in the even the plaintiffs claim is frivolous or groundless. <u>Christiansburg Garment Co. v. Equal Employment Opportunity Commission</u>, 434 U.S. 412, 422 (1978).   Accordingly, as in <u>Brooks</u>, even if an arbitrator in this matter were to follow the "express" provisions of Title VII and the NYCHRL with respect to attorney fees, Ms. Ragone would still be denied her statutory protections against paying defendant's attorneys fees as "authoritatively interpreted" by the courts.   As expressed in <u>Brooks</u>, "[Defendant's] arbitration policy would appear to forbid [protections to Ms. Ragone against paying defendant's attorney fees] that federal courts would grant, because the [protection] is not '*expressly*' provided for by the applicable statute." <u>See</u> <u>Brooks</u>, 293 F.3d at 171.   This is an impermissible abrogation of Ms. Ragone's statutory protections.

Likewise, a Title VII plaintiff's protection against <u>mandatory</u>, as opposed to *discretionary*, awards of attorneys fees to a successful defendant, is a <u>substantive right and</u>

protection afforded by the law.   Congress could have chosen to make attorney fee award under

Title VII mandatory, but chose not to and left the issue to a court's discretion.   The very purpose

of allocating *discretionary* power with the court in Title VII and the NYCHRL in awarding fees

is to serve the interest of justice and to protect against unjust results given the totality of the

circumstances *of a specific case*. This substantive protection is <u>denied</u> Ms. Ragone given the

Arbitration Agreement's explicit language that the arbitrator "shall" award attorney fees to the

prevailing party no matter the individualized or special circumstances with which the arbitrator

may be faced with.   Again, this denial of substantive statutory protection to Ms. Ragone in

arbitration that undisputedly would have been available in court is unconscionable.

2.     <u>Defendant Recovers Attorneys Fees If It Prevails In Enforcing Arbitration Agreement in Court</u>

Not only does the Arbitration Agreement improperly attempt to chill Ms. Ragone's

incentive to bring her employment discrimination claims in arbitration, it further also

impermissibly attempts to deter her from even *challenging* the enforceability of the Arbitration

Agreement in the first place in court.   The Agreement states that "I understand, acknowledge,

and agree that in the event that I… challenge the validity of this Agreement, the prevailing party

**shall** be entitled to all reasonable costs and outside and in-house attorney's fees arising from said

action." (emphasis added). Calli Aff., Exh. A., ¶ 9.

As written, the Arbitration Agreement requires the court to compel Ms. Ragone to pay

Defendant its attorney fees *if* it grants Defendant's Motion to Compel Arbitration, no matter that

Ms. Ragone arguments challenging arbitration are made in good faith and are reasonable.   The

practical effect and purpose again is to impose on Ms. Ragone the risk of an untenable financial

burden in seeking to validate her statutory rights in order to deter the exercise of those rights.

28

Moreover, since the issue of arbitrability obviously does <u>not</u> go the underlying merits of Ms. Ragone's discrimination and retaliation claims, the imposition of fee shifting in the mere *contractual enforcement* stage is <u>not</u> supported by or pursuant to the fees shifting provisions of Title VII or the NYCHRL. The potential imposition of fees against Ms. Ragone for merely challenging the enforceability of the Arbitration Agreement, accordingly, contravenes the American Rule that each party is responsible for its own fees in breach of contract actions. <u>United States Naval Inst., v. charter Communications, Inc.</u>, 962 F.2d 692, 698 (2nd Cir. 1991) Although it may permissible for parties to contractually agree to a "loser pays" provision in most arm-length, *commercial* contracts, the imposition of a "loser pays" provision in a contract of adhesion, particularly a "take it or leave" employment arbitration agreement, is unconscionable. As explained in <u>Equitable Lumber Corp. v IPA Land Development Corp.</u>, 38 N.Y.S.2d 516, 523 (1976),

> "**In the proper case a provision that one party to a contract pay the other party's attorney's fees in the event of breach may be unconscionable**. Here, however, the parties are commercial entities dealing at arm's length with relative equality of bargaining power. There is no evidence that the **contract is one of adhesion in that its terms were unfair or nonnegotiable**."

<u>Id</u>. at 523.

In contrast, in *this* case, however, it is undisputable that the Arbitration Agreement *is* a contract of adhesion and its terms were non-negotiable. "Contracts of adhesion " are contracts prepared by one party and presented to another, in a disadvantageous bargaining position, on a "take it or leave it" basis. <u>Barrette v. Home Lines, Inc.</u>, 168 F.Supp. 141, 143, n.4 (S.D.N.Y. 1958); <u>see</u> <u>also</u> <u>In re Currency Conversion Fee Anti-Trust Litigation</u>, 362 F.Supp.2d 237 (S.D.N.Y. 2005)( "[A]

contract of adhesion is a contract formed as a product of a gross inequality of bargaining power between parties") quoting JLM Indus. V. Stolt-Neilsen SA, 387 F.3d 163, 169 (2nd Cir. 2004). Although a contract of adhesion may be enforceable, a contract of adhesion that *contains* unconscionable or oppressive terms is not enforceable. Id. ("Adhesion contracts tainted by unconscionability are unenforceable"), citing Brennan, supra, 153 F.supp.2d. at 416. ("An unconscionable contract of adhesion is not a valid contract" ).

There can be no dispute that Ms. Ragone, in seeking a job as a stylist with Atlantic Video, was in a grossly inferior bargaining position relative to Defendant, and without representation or the advice of an attorney, was compelled to sign a standard from Arbitration Agreement imposed by Defendant to its employees as a condition of getting a job to support herself.   Under *these* circumstances, the inclusion of provision forcing Ms. Ragone to pay Defendant's attorneys fees for merely bringing her discrimination claims in court and unsuccessfully challenging the enforceability of an arbitration provision  is precisely a "proper case" in which  "a provision that one party to a contract pay the other party's attorney's fees in the event of breach may be unconscionable." See Equitable Lumber Corp.,  38 N.Y.S.2d at 523. The provision is grossly overreaching, unfair, and unduly oppressive to Ms. Ragone, and substantially deters the exercise of her statutory rights.

Indeed, undersigned counsel has not located a single case where a defendant employer even tried to impose a "loser pays" provision against an employee for merely challenging enforceability of the arbitration agreement in court.

### 3.    Arbitrator's Decision is "Non-Appealable"

The Arbitration Agreement is also unconscionable and unenforceable because it expressly provides that there is no recourse to court review of the arbitration proceedings.

The Arbitration Agreement provides, "I understand that the sole and exclusive jurisdiction and venue of any action arising hereunder shall be in the AAA and any ruling made by the AAA or the arbitrator shall be binding **and non-appealable**." Calli Aff., Exh. A., ¶ 2. (emphasis added).   This provision expressly and purposefully thwarting any judicial review of the arbitration proceeding is unconscionable as a matter of law.

It is well established that a "Plaintiffs may arbitrate Title VII claims only in an arbitral forum that meets three requirements to ensure that the arbitration will not subvert the Title VII statutory scheme. First, the arbitration must meet certain standards of procedural fairness." Martens v. Smith Barney, Inc., 181 F.R.D. 243, 255  (S.D.N.Y 1998).  In Martens, the court cited approvingly to Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465, 1468-69 (D.C. Cir. 1997) in making clear that this "procedural fairness" includes the right to "meaningful **review** for Title VII claims".  Martens, 181 F.R.D. at 255. (emphasis added).  Indeed, in Cole, the court states explicitly that "the nearly unlimited deference paid to arbitration awards in the context of collective bargaining is not required, and **not appropriate, in the context of employees' statutory claims**. In this context, the **Supreme Court has assumed that arbitration awards are subject to judicial review sufficiently rigorous to ensure compliance with statutory law**." Cole, 105 F.3d at 1469. See Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 232  (1987) ("although judicial scrutiny of arbitration awards necessarily is limited, such review is sufficient to ensure that arbitrators comply with the requirements of the statute").

Indeed, Defendant's attempt to preclude reviewability of any arbitration proceedings is contrary to the explicit statutory requirements and protections of the Federal Arbitration Act. The FAA explicitly states that an arbitration award will be vacated by a district court "(1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident

partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10.  Also, it has been established that, under the FAA, and arbitrator's decision will be vacated if it is "in manifest disregard of the law." <u>Westerbeke Corp.</u> <u>v. Daihatsu Motor Co., Ltd.</u>, 304 F.3d 200, 208 (2nd Cir. 2002).  The Arbitration Agreement that Defendant seeks to impose in this matter explicitly <u>denies</u> Ms. Ragone each of the protections afforded by judicial review under the FAA.

Furthermore, the provision of the Arbitration Agreement stating that an arbitration ruling is "non-appealable" is directly contrary to <u>New York law</u>, which the Agreement explicitly invokes.  The Agreement provides that "the Agreement shall be construed and enforced in accordance with the <u>laws of the State of New York</u>, without regard to principles of conflict of law." Calli Aff., Exh. A.   As explained in the Practice Commentaries to CPLR 7501, this language is sufficient to bring the arbitration agreement within the "framework" of the New York CPLR:.

> "As discussed in the main volume at pages 311-15, the parties themselves may reject the applicability of the FAA, even if the contract affects interstate commerce, if they include a sufficiently explicit choice-of-law clause…. In order to bring the framework of the CPLR into play, the parties would need to include a statement to the effect that both the agreement "and its enforcement" are to be governed by New York law. 4 N.Y.3d at 253, 793 N.Y.S.2d at 835."
> NY CPLR 7501 (Practice Commentaries for 2005, C7501: Interface with the Federal Arbitration Act).

Under New York, law, it is well established that "arbitration decisions, whether arising from mandatory or consensual arbitration proceedings, are subject to limited judicial review pursuant

to CPLR article 75, <u>in order to comport with constitutional requirements of due process</u>" <u>Unigard Mut. Ins. Co. v. Hartford Ins. Group</u>, 485 N.Y.S.2d 805, 807 (N.Y.A.D. 2 Dept.,1985) (emphasis added).    Under New York law, an arbitration ruling will be vacated by a reviewing court if it is "totally irrational." <u>Kaplan v. Werlin</u>, 626 N.Y.S.2d 815, 817 (N.Y.A.D. 2 Dept. 1995).

In sum, whether interpreted under the FAA or New York law, the Arbitration Agreement is written to purposefully to **<u>deny</u>** Ms. Ragone her statutory and constitution rights to judicial review of an arbitration ruling *even if* the ruling is (1) in manifest disregard of law, (2) is totally irrational, (3) is procured by corruption, fraud, or undue means; (5) where there was evident partiality or corruption in the arbitrators; (6) where the arbitrators were guilty of misconduct, or (7) where the arbitrators exceeded their powers.    The Arbitration Agreement's denial of the right to judicial review to Ms. Ragone is unconscionable, oppressive, overreaching, and contrary to both explicit statutory protections and the public policies underlying the FAA and the NY CPLR 7501 et seq.

### 4.    The Arbitration Agreement Impermissibly Denies Ms. Ragone Her Statutory Rights <u>In Court</u>

The Arbitration Agreement not only attempts to deter and abrogate Ms. Ragone's statutory rights in an arbitral forum, but incredibly, purports to do so in court as well.

Paragraph 6 of the Agreement provides that:

"In the event that any court determines for any reasons that the Procedure is not binding otherwise allows any litigation regarding a claim or portion thereof covered by the Procedure to go forward, I agree that (a) the court proceeding must be commenced no later than six (6) months after the earlier of the termination of my employment at the Company or the date that my claim arose; (b) I expressly waive all rights to trial by jury in such litigation; and (c) I understand, acknowledge, and agree that any and all discovery

engaged in by the parties to the court proceeding shall be limited to one deposition and one set of thirty-five (35) interrogatories with no sub-part."                    "

The Agreement, accordingly, shortens Ms. Ragone's statute of limitation in filing with the court to only 6 months, denies her a right to a jury trial in court, and limits her discovery in court to a single deposition.  These provisions are oppressive and unconscionable and clearly violative of federal law.

In addition to discussion above in Section I(A)(1) , the six months statute of limitation for bringing her discrimination and retaliation claims in court is also unlawful because it is effectively impossible for a plaintiff to file a Title VII claims *in court within six months*.  It is beyond dispute that a plaintiff must first file a Charge of Discrimination with the Equal Employment Opportunity Commission before she has the right to file a civil suit in district court under Title VII.  42 U.S.C. 2000e-5(e) and (f).  Once a Charge is filed, the Commission has 180 days in order to determine whether it wishes to file a civil action itself, or whether it issues a right to sue letter advising a claimant that she has 90 days to file suit herself. 42 U.S.C. 2000e-5)(f)(1).  Indeed, a claimant cannot request a Right to Sue letter from the EEOC until the expiration of 180 day after the filing of the Charge of Discrimination. 29 C.F.R. § 1602.28.   In short, even if a claimant files a Charge of Discrimination with the EEOC on the very same date as the unlawful discharge, the claimant will not be in possession of a Right to Sue letter to proceed in court within the 6 month statute of limitations imposed by the Arbitration Agreement. The Arbitration Agreement thus effectively precludes the assertion of a Title VII claim in court through the imposition of an administratively impossible statute of limitations. This is not only unconscionable and oppressive, it borders on the nonsensical.

The same holds true for the provision that limits discovery in court to a single deposition. This is directly contrary to Rule 30(a)(2()A) of the Federal Rules of Civil Procedure, which states that a party can engage in 10 depositions without obtaining leave from the court.

Moreover, even in the context *of arbitration* (let alone in district court itself) courts faced with this type of limitation on discovery have routinely held it to be unconscionable as improperly impeding a claimant's ability to establish her case. Ferguson v. Countrywide Credit Indus., Inc., 298 F.2d 778, 786 (9th cir. 2002) (agreement unconscionable where discovery provision limited deposition to four corporate representatives); Lucey v. FedEx Ground Package Systems, Inc., 2007 WL 3052997, *11-12 (D.N.J. 2007) (provision allowing deposition only with respect to damages is unconscionable); Sherwood v. Blue Cross, 2007 WL 2705262, *4-5 (E.D. Cal. 2007) (provision limiting parties to a single deposition is unconscionable); Ostroff v. Alterra Healthcare Corp., 433 F.Supp.2d 538, 545 (E.D. Pa. 2006) (provision limiting plaintiff to one deposition of expert is unconscionable); Fitz v. NCR Corp., 118 Cal.App.4[th] 702, 714, 13 Cal.Rptr.3d 88 (2004) (provision allowing only two fact witness depositions and one expert deposition is unconscionable).

It is further important to note that the Arbitration Agreement does not even provide the court with the *discretion* to allow for additional depositions if necessary for Ms. Ragone to prove her claims.

Finally, most of these limitations imposed on Ms. Ragone are entirely **one-sided**. The Arbitration Agreement does <u>not</u> require Atlantic Video to assert its claim in court within six months. ("*I agree* that the court proceeding must be commenced in six months"). The Arbitration Agreement does <u>not</u> require Atlantic Video to waive its right to a jury trial. ("*I*

*expressly waive* all rights to a trial by jury in any such litigation.").  The "I" in each of these provisions is *Ms. Ragone* only, who is the sole signatory to the Arbitration Agreement.

In short, apart from an arbitral forum, the Arbitration Agreement (1) seeks to make it impossible for Ms. Ragone to even assert a Title VII claims in federal court by an administratively impossible statute of limitations, and (2) seeks to deny Ms. Ragone the right in court to have sufficient discovery to establish her claim.   Once again, at every turn, the Arbitration Agreement seeks to disadvantage and prejudice Ms. Ragone in the exercise of her statutory rights, thus revealing (and constituting) its overarching oppressiveness and unconscionability.

## B.    Procedural Unconscionability

In light of the numerous substantively unconscionable provisions in the Arbitration Agreement discussed above, there is more sufficient evidence of procedural unconscionability in the formation of the agreement for the court to find the entire agreement unenforceable.

The test for procedural inadequacy in forming a contract is whether, in light of all the facts and circumstances, a party lacked "a meaningful choice" in deciding whether to sign the contract. Brennan v. Bally Total Fitness, 198 F.Supp.2d 377, 382 (S.D.N.Y. 2002)

Although both substantive and procedural unconscionability should be present for the court to refuse to enforce an arbitration agreement, "they need not be present in the same degree." Armendariz v. Foundation Health Psychcare Services, Inc., 24 Call.4[th] 83, 114 (2000) "Essentially, a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves." Id.  "In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is

required to come to the conclusion that the terms is unenforceable and vice versa. Id.  See also State v. Wolowitz, 468 N.Y.S.2d 131 (N.Y.A.D. 2 Dept. 1983) ("it can be said that procedural and substantive unconscionability operate on a "sliding scale"; the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa").

In this case, the evidence of a lack of "meaningful choice" on Ms. Ragone's part is more than adequate to tip the sliding scale of unconscionability to non-enforceability.

This was not a commercial contract between two sophisticated parties acting at arms lengths.  There is no dispute that Ms. Ragone was in a grossly unequal position to Defendant with respect to education and experience.  Ms. Ragone does not have a college degree and has no experience or background in business or human resources.

There is no dispute that Ms. Ragone was not represented by counsel when she purportedly signed the Arbitration Agreement.

There is no dispute that the Arbitration Agreement itself does not advise Ms. Ragone that she should seek the advice of counsel or should have the opportunity to do so.

There is no dispute that no one from Atlantic Video at any time told Ms. Ragone that she should have the Arbitration Agreement reviewed by counsel.

Indeed, it is undisputed that Ms. Ragone was in fact not given the opportunity to have the Arbitration Agreement or anything else she signed reviewed by an attorney.

Ms. Ragone was simply given various documents to sign on a "take it or leave it" basis and was made to sign these documents at the time they were given to her in front of manager Ted Nelson in order to obtain the job.  Atlantic Video did not afford Ms. Ragone the time and

opportunity to take any documents home to review them prior to signing them. Atlantic Video did not afford Ms. Ragone any opportunity to negotiate or even discuss anything that she signed.

Ms. Ragone needed a permanent job, and therefore simply signed several documents placed before her without knowing or understanding the legal import of any of the terms. No one from Atlantic Video described or explained anything to Ms. Ragone regarding what she was made to sign. There is no dispute that Ms. Ragone had to sign whatever was placed in front of her as a condition of obtaining employment.

In the face of substantively unconscionable provisions in an employment arbitration agreement, precisely these *same* types of *procedural* facts have been held sufficient to find the agreement unenforceable. Brennan v. Bally Total Fitness, 198 F.Supp.2d 377, 382-84 (S.D.N.Y. 2002) (procedural unconscionability found where (1) there was disparity in bargaining power between employer and employees, (2) manager failed to given employee adequate time to review the contract, and (3) manager failed to inform the employee that she could review the document with an attorney, (4) manager conceded that those who did not sign document would not be promoted).

See also Armendariz v. Foundation Health Psychcare Services, Inc., 24 Cal.4[th] 83, 114 (2000) (procedural unconscionability found where employment arbitration agreement "was imposed on employees as a condition of employment and there was no opportunity to negotiate").

### C.    The Unconscionability of the Arbitration Agreement Is Irredeemable, And Cannot Be Severed

The court should find that the Arbitration Agreement as a whole, containing numerous unconscionable and oppressive terms, is irredeemably tainted by unconscionability and unlawful

purpose.   As such, the unconscionability cannot simply be severed from the agreement, which should be held unenforceable in its entirety

The court's analysis in <u>Armendariz v. Foundation Health Psychcare Services, Inc.</u>, 24 Cal.4[th] 83, 114 (2000) is instructive and should guide the court here.  The court found that "the arbitration agreement contains more than one unlawful provision; it has both an unlawful damages provision and an unconscionable unilateral arbitration clause."  The court concluded that "**such multiple defects** indicate a **systematic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage**.  In other words, given the multiple unlawful provisions, the trial court did not abuse it's discretion in concluding that the **arbitration agreement is permeated by an unlawful purpose**." <u>Id</u>. at 124.(emphasis added).

Precisely the same is true here.  A reading of the Arbitration Agreement as a whole, which has no less than four (4) separate unconscionable provisions, shows a "systematic effort" to impose an unfair process and terms on Ms. Ragone, and a *concerted* effort to interfere with the exercise of her statutory rights. As such the entire Agreement is "permeated by an unlawful purpose."  As a matter of basic equity, Atlantic Video should <u>not</u> be allowed to impose on its employee a "take it or leave" arbitration agreement that is literally packed with oppressive and unlawful provisions meant to disadvantage the employee, and then argue "Never Mind" with respect to those same unlawful terms.   Atlantic Video should not be rewarded for its overreaching conduct by retaining the benefit of a contract whose main purpose, as evidenced by its "multiple defects," was to unfairly prejudice Ms. Ragone.

Numerous court, faced with similar circumstances of whether to sever multiple unconscionable provisions, have held the entire agreement unenforceable. <u>David v. O'Melveny</u>

& Meyers, 485 F.3d 1066, 1084 (9th Cir 2007)(four unconscionable provisions in arbitration agreement cannot be stricken or excised, and given the scope of procedural and substantive unconscionability, the entire agreement is unenforceable); Simpson v. MSA of Myrtle Beach, Inc. ,373 S.C. 14, 644 S.E.2d 663 (2007) (Unconscionable provisions in arbitration clause in the adhesion contract between customer and automobile dealership were not severable, but rather, the entire clause was wholly unconscionable and unenforceable based on the cumulative effect of multiple oppressive and one-sided provisions; severing only the offending provisions would not achieve the intent of the parties, but would effectively "rewrite" the contract); Schwartz v. Alltel Corp., 2006 WL 2243649, *6-7 (Ohio App. 8 Dist.,2006) (The procedural and substantive unconscionability of the arbitration clause in wireless phone service agreement warranted striking the overall agreement, despite the presence of a severability provision purporting to allow all but the invalid provisions to remain in force; the unenforceable portions of the arbitration clause were so overwhelming as to taint the rest of the agreement.); Abramson v. Juniper Networks, Inc., 115 Cal.App.4th 638, 659-660. 9 Cal.Rptr.3d 422, 438-39 (Cal.App. 6 Dist. 2004) (The fact that an arbitration agreement contains more than one unlawful provision may indicate a systematic effort to impose arbitration on an employee as an inferior forum that works to the employer's advantage, and may warrant the conclusion that the arbitration agreement is permeated by an unlawful purpose, such that severance of the illegal provisions is not warranted); Plaskett v. Bechtel International, Inc., 243 F.Supp.2d 334, 345 (D. Vi. 2003) (Where arbitration provisions in employment agreement were permeated with unconscionable terms, severance of terms was not appropriate, so as to allow enforcement of arbitration); Torrance v. Aames Funding Corp., 242 F.Supp.2d 862, 876 (D.Or.,2002) (Unconscionable provisions in arbitration agreement between mortgagor and mortgagee were nonseverable, and

thus agreement was so permeated with unconscionability as to render agreement invalid; agreement established unified procedure for resolving disputes, and removal of unconscionable provisions regarding limitation on damages, confidentiality, and payment of portion of arbitrator fees would rewrite the contract).

## II.    THE GENUINESS OF THE ARBITRATION AGREEMENT PRODUCED BY ATLANTIC VIDEO IS DISPUTED, AND MS. RAGONE IS ENTITLED TO LIMITED DISCOVERY ON THIS ISSUE

Even if the court finds the Arbitration Agreement enforceable, enforcement at this stage is premature given the record.

The Arbitration Agreement document which Atlantic Video relies on is insufficiently authenticated to warrant enforcement without limited discovery as the genuineness of the document, which is *disputed* by Ms. Ragone.

First, all that Mr. Calli attests to is that he purportedly located the document in Ms. Ragone's personnel file. Calli Aff., ¶ 4. Mr. Calli does not state that he witnessed Ms. Ragone sign the document or that he knows it to contain her genuine signature. Mr. Calli does not state who placed the document in Ms. Ragone's personnel file or when. Indeed, Mr. Calli does not even state whether the document he found in the file even purports to be contain an original signature, or is itself merely a copy of another original document. In short, in no way is Mr. Calli's Affidavit remotely sufficient to establish the genuineness of Ms. Ragone's purported signature on the document.

For her part, Ms. Ragone explicitly states that she does not believe that the document contains her genuine signature. Ms. Ragone states that although she does recall signing certain other documents placed before her, she has no recollection whatsoever of ever having reviewed

or signed the Arbitration Agreement.  Ms. Ragone also states that she does not believe the

document to be genuine because her printed name is not remotely in her handwriting.

Furthermore, the document is suspect on its face.  The document is not in final form, as it

clearly contains computer edits on the upper right hand corner, showing that the documents was

some type of draft being changed and modified.   Ms. Ragone states that she would have noted

and recollected any such computer edits on the documents she was instructed to sign, which she

did not.

Given this state of the record, Ms. Ragone cannot be compelled to arbitrate her statutory

claims without first being given the opportunity to (1) review the original "Arbitration

Agreement," if one exists, (2) to have either the original or certified copy reviewed and analyzed

by a handwriting expert, and (3) to conduct such additional limited discovery as is necessary to

determine the genuineness of the document submitted by Mr. Calli.  Cavendish Traders, Ltd. v.

Nice Skate Shoes, Ltd.,117 F.Supp.2d 394 (S.D.N.Y.,2000)( issue as to validity of signature on

guarantee agreement precluded summary judgment).

## III.    MS. RAGONE IS NOT BOUND TO ARBITRATE HER DISPUTE AGAINST DEFENDANT ESPN BECAUSE SHE HAS NOT AGREED TO SUBMIT ANY CLAIMS AGIANST ESPN TO ARBITRATION

The fact that arbitration agreements are contractual in nature is a well-established

principle of law, and both the United States Supreme Court and the Second Circuit have clearly

held that "a party cannot be required to submit to arbitration any dispute which he has not agreed

so to submit."  Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995),

citing United Steelworkers of Am. V. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960).

Ms. Ragone has clearly not agreed to submit to arbitration **any** disputes with Defendant ESPN,

as there exists **no** agreement to that effect between the two parties.

**A.    As A Non-Party And Non-Signatory To The Arbitration Agreement, ESPN Cannot Enforce The Agreement Under Any Accepted Theory**

Regardless as to the enforceability or validity of the Arbitration Agreement with respect to Atlantic Video, it <u>cannot</u> be used by Defendant ESPN to compel Ms. Ragone to arbitrate her claims, because ESPN was in no way a party to this agreement.

While the Second Circuit has recognized several common law principles of contract law that may allow non-signatories to enforce an arbitration agreement, **none** of these principles are relevant to the instant action.  <u>Ross v. American Express Co.</u>, 478 F.3d 96, 99 (2d Cir. 2007). These principles can be properly classified into five separate theories:  1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel.  <u>Thomson-CSF, S.A.</u>, 64 F.3d at 776.

There can be no question that Ms. Ragone cannot be bound by an incorporation theory. A non-signatory may only base its claim on incorporation if it has entered into a separate contractual agreement with the party it wishes to compel into arbitration, and that agreement incorporates the existing arbitration clause.  <u>Id.</u> at 777; <u>see</u> <u>also</u>, <u>Import Export Steel Corp. v. Mississippi Valley Barge Line Co., 351 F.2d 503, 505-506 (2d Cir. 1965)</u> (holding that a separate agreement in which the non-signatory expressly assumed the "obligations and privileges" of the signatory party constituted sufficient grounds to enforce arbitration).  There exists no contractual agreement with ESPN incorporating any element of Ms. Ragone's agreement with Atlantic Video, and as ESPN has not even attempted to show otherwise, Ms. Ragone cannot be bound by incorporation.

Likewise, it cannot be argued that either Ms. Ragone or ESPN assumed any of the obligations from the agreement with Atlantic Video in regards *to their own working relationship*. If a party has not signed an agreement, it may still be bound by the contract's provisions if its

43

conduct indicates that it is assuming the specified obligations. Thomson-CSF, S.A., 64 F.3d at 777. ESPN at no point implied or demonstrated that it considered itself to be bound by any portion of Ms. Ragone's purported Arbitration Agreement with Atlantic Video, and thus it cannot attempt to claim any protection from that agreement.

Further, there clearly exists no agency or alter-ego relationship between ESPN and Atlantic Video, such that it could be suggested that Atlantic Video's signature effectively binds ESPN to the obligations and privileges of its agreement with Ms. Ragone. For a non-signatory to enforce an arbitration agreement based on its relationship with a signatory, it must show such a close connection that one corporation "dominates and controls" the affairs of the other. Matter of Arbitration Between Keystone Shipping Co. and Texport Oil Co., 782 F.Supp. 28, 30 (S.D.N.Y. 1992), citing Coastal States Trading, Inc. v. Zenith Nav. S.A., 446 F.Supp. 330, 336 (D.C.N.Y. 1977). ESPN asserts only a loose working relationship with Atlantic Video; claiming to be only a "significant client" that makes use of Atlantic Video's New York City facilities. Def. Brief p. 7. This relationship does not entail the level of "domination and control" necessary in order to allow ESPN to enforce Atlantic Video's arbitration agreement against Ms. Ragone.

Most significantly, as it is the theory to which ESPN looks for the most support, equitable estoppel is also inapplicable according to the facts of the instant case. Under this theory, a signatory "will be estopped to 'avoid arbitration with a non-signatory when the issues the non-signatory is seeking to resolve are intertwined with the agreement that the estopped party has signed." Chase Mortg. Company-West v. Bankers Trust Co., No. 00 Civ. 8150 2001 WL 547224, at *2 (S.D.N.Y. May 18, 2001), quoting Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc., 198 F.3d 88 (2d Cir. 1999). In Chase Mortgage, the court applied a two-part test to determine whether the signatory's claims are sufficiently "intertwined with the

underlying contract obligations," such that equitable estoppel applies. <u>Chase Mortg.</u>, 2001 WL 547224, at *3. Under this test, the non-signatory must show that "the signatory's claims arise under the subject matter of the underlying agreement," and that this is "a close relationship between defendant signatory and defendant non-signatory." <u>Id</u>. at *2. The court required the satisfaction of **both factors**, which ESPN completely fails to provide. <u>Id</u>. at *2-3.

While the first prong of the estoppel analysis may be satisfied, as Ms. Ragone's harassment and retaliation claims are referenced in the arbitration agreement, there can be no argument that there is **not** a close relationship between ESPN and Atlantic Video, such that ESPN can claim the privilege of the arbitration agreement. ESPN relies on <u>Chase Mortgage</u> and <u>Choctaw Generation L.P. v. Am. Home Assur. Co.</u>, 271 F.3d 403 (2d Cir. 2001) in support of its contention that the relationship between defendant parties merits ESPN's compelling Ms. Ragone into arbitration based on her agreement with Atlantic Video. However, in doing so, ESPN blatantly fails to fails to mention the dispositive facts that render the two cases inapposite to this matter.

In <u>Chase Mortgage</u>, the court found the requisite close relationship between the defendant signatory and defendant non-signatory. <u>Chase Mortg.</u>, 2001 WL 547224, at *3. However, the court based its finding on the fact that the defendant signatory was the defendant non-signatory's **parent corporation**, and thus had a superior level of control over defendant non-signatory. <u>Id</u>. These facts are clearly not comparable to those of the instant case. Atlantic Video, as the defendant signatory, exercised **no control whatsoever** over ESPN, the defendant non-signatory. The two corporations were in no way related beyond Atlantic Video's providing certain facilities and services for ESPN, which plainly does rise to the level of closeness required by the <u>Chase Mortgage</u> court in order to fulfill the second prong.

Furthermore, in both <u>Chase Mortgage</u> and <u>Choctaw</u>, the defendants non-signatory were **active participants** in the formation of the contract between the defendants signatory and the plaintiffs.  In <u>Chase Mortgage</u>, the defendant non-signatory had guaranteed the defendant signatory's obligations under the contract containing the arbitration agreement.  <u>Id</u>. at *1.  By assuming the obligations of the contract, it was also allowed to assume the privilege of enforcing the arbitration agreement.  <u>Thomson-CSF, S.A.</u>, 64 F.3d at 777.  Similarly, the defendant non-signatory in <u>Choctaw</u> issued a security bond securing performance under a construction contract between the defendant signatory and the plaintiff that contained the arbitration agreement.  <u>Choctaw</u>, 271 F.3d at 404-05.  The court specifically notes that the security bond incorporates by reference the underlying construction contract that contained the arbitration agreement, thus allowing the defendant non-signatory to enforce the arbitration agreement.  <u>Id</u>. at 406.  As previously mentioned, ESPN does not even attempt to assert the existence of any contractual agreement with Ms. Ragone that either incorporates or assumes **any provision** of Ms. Ragone's agreement with Atlantic Video.  Accordingly, the factual premises of both <u>Chase Mortgage</u> and <u>Choctaw</u> utterly fail to support ESPN's claim to arbitration in this case.

Perhaps the most significant difference in the cited cases when compared to the instant matter is the fact that in both <u>Chase Mortgage</u> and <u>Choctaw</u>, **all parties involved** had relationships with each other **at the time the contracts were formed**.  <u>Chase Mortg.</u>, 2001 WL 547224, at *1; <u>Choctaw</u>, 271 F.3d at 404-05.  Conversely, Ms. Ragone had **no relationship whatsoever** with ESPN at the time she entered into her employment contract with Atlantic Video, giving her absolutely **no reason** to infer that the arbitration agreement would be extended her work for ESPN.

Moreover, ESPN **does not even correctly apply the second prong of the equitable estoppel test**, on which it places the bulk of its reliance. While it clearly states the standard mandating a close relationship between "defendant signatory and defendant non-signatory," its analysis is not even focused on this relationship. Def. Brief at 6. To satisfy this prong, it includes only **one applicable sentence** stating, "Plaintiff has alleged both that ESPN was a 'significant client' of Atlantic Video and 'operated various shows, including 'Cold Pizza' out of Atlantic Video's studio in [New York City]." Def. Brief at 7. ESPN then attempts to conceal the fact that requisite relationship between the defendants **does not exist**, by instead discussing the relationship that formed between Ms. Ragone and ESPN after she began working for the defendants ("Indeed, Plaintiff cannot assert her statutory discrimination claims against ESPN unless she is alleging the existence of an employment relationship.") Def. Brief at 7. Thus, ESPN **hardly even attempts** to show that it meets the Second Circuit's standard for the enforcement of an arbitration agreement by a non-signatory.

### B.    ESPN Was Not An Intended Beneficiary Of The Arbitration Agreement

Aside from failing to meet the Second Circuit's standard to qualify as a non-signatory party to the arbitration agreement, ESPN also does not qualify as an intended beneficiary of the agreement, thus failing to meet the Second Circuit's only alternative standard allowing a non-signatory to enforce an arbitration agreement.

The Second Circuit has held that a non-party to a contract may fall within the scope of an arbitration agreement as a third-party beneficiary, if it can show that this would comport with the contracting parties' intent. McPheeters v. McGinn, Smith and Co., Inc., 953 F.2d 771, 772 (2d Cir. 1992). However, in McPheeters, the Court declined to apply this privilege where the arbitration agreement contained no language specifying the benefits to be conferred upon the

non-party.  Id. at 773; see also Borsack v. Chalk & Vermilion Fine Arts, Ltd., 974 F.Supp. 293,

300 (S.D.N.Y. 1997) (observing that a non-party qualifies as a third-party beneficiary if it

appears that no one other than the non-party can recover in the event the contract is broken, or if

the contract language clearly indicates the non-party is a beneficiary).

      This Second Circuit further extended this rationale to prohibit incidental third-party

beneficiaries from enforcing arbitration agreements to which they were not a party, where this

was not the clear intent of the parties.  McPheeters, 953 F.2d at 773, citing Kyung Sup Ahn v.

Rooney Pace, Inc., 624 F.Supp. 368, 371 (S.D.N.Y. 1985), in turn citing Vazman, S.A. v.

Fidelity International Bank, 418 F.Supp. 1084, 1086 (S.D.N.Y. 1976).  The McPheeters court

declined to allow a non-party that received incidental benefits from the parties' contact to

enforce the contract's arbitration agreement, because the parties had entered into the contract for

their own benefit, "not for the purpose of conferring a benefit on [the non-party]."  McPheeters,

953 F.2d at 773.

      ESPN clearly does not qualify as a beneficiary of Ms. Ragone's and Atlantic Video's

agreement.  The agreement **does not even reference** ESPN, or make any mention of Ms.

Ragone's possible work with the defendant.  There is **no evidence whatsoever** that Ms. Ragone

and Atlantic Video intended for their agreement to benefit ESPN **in any way**, and even if ESPN

did receive some incidental benefit as a result of the contract, there is nothing to suggest that the

parties intended for the contract to benefit anyone other than themselves.  Accordingly, ESPN

has no justification for claiming that the arbitration agreement included in Ms. Ragone's

employment contract with Atlantic Video should be extended to cover its own dispute with Ms.

Ragone.

## CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests that Defendants' Motions To

Dismiss and To Compel Arbitration be denied.

David Zatuchni /s/  (2516)
David Zatuchni, Esq.
1 West Street
Suite 100
New York, NY 10004
Phone: (212) 785-8980
davidz@zatuchniassociates.com
Counsel for Plaintiff, Rita Ragone

Dated:  October 29, 2007

49